# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# TERRE HAUTE DIVISION

| | | |
|---|---|---|
| MARK KRIEGER and KRIEGER FAMILY FARMS, LLC, individually and on behalf of all others similarly Situated, | ) ) ) ) | Case No. 2:22-CV-499 |
| | ) | CLASS ACTION COMPLAINT |
| Plaintiffs, | ) ) | |
| BAYER CROPSCIENCE LP; BAYER CROPSCIENCE, INC.; CORTEVA, INC.; PIONEER HI-BRED INTERNATIONAL, INC.; CARGILL INCORPORATED; BASF CORPORATION; SYNGENTA CORPORATION; WINFIELD SOLUTIONS, LLC; UNIVAR SOLUTIONS, INC.; FEDERATED CO-OPERATIVES LTD.; CHS INC.; NUTRIEN AG SOLUTIONS INC.; GROWMARK INC.; GROWMARK FS, LLC; SIMPLOT AB RETAIL SUB, INC.; AND TENKOZ, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) | |

<u>CLASS ACTION COMPLAINT</u>

1.      Plaintiffs Mark Krieger and Krieger Family Farms, LLC on behalf of themselves individually and on behalf of all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action complaint to recover injunctive relief, treble damages, and other relief as appropriate based on Defendants' Bayer CropScience, LP, Bayer CropScience, Inc., Corteva, Inc., Pioneer Hi-Bred International, Inc., Cargill Inc., BASF Corporation, Syngenta Corporation, Winfield Solutions, LLC, Univar Solutions, Inc., Federated Co-Operatives Ltd., CHS Inc., Nutrien Ag Solutions Inc., Growmark Inc., Growmark FS, LLC, Simplot AB Retail Sub, Inc., and Tenkoz, Inc. (collectively,

"Defendants") violations of federal and state antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment laws of the several States.

2.     Plaintiffs seek to represent a class and sub-class consisting of persons and entities who purchased Crop Inputs, for their own use and not for resale, in the United States from at least as early as January 1, 2014 through the present (the "Class Period") from the Defendants or through Defendants' authorized retailers.

## NATURE OF ACTION

3.     This action arises from an unlawful agreement between Defendants—manufacturers, wholesalers, and retailers of Crop Inputs—to artificially increase and fix the prices of seeds and crop protection chemicals such as fungicides, herbicides, and insecticides ("Crop Inputs") used by farmers throughout the United States.

4.     The market for Crop Inputs used by American farmers is one of the largest markets in the world with annual sales exceeding $65 billion.

5.     Defendants Bayer CropScience, Inc., Bayer CropScience, LP, Corteva, Inc., Pioneer Hi-Bred International, Inc., Syngenta Corporation, and BASF Corporation (the "Manufacturer Defendants"), together with Defendants Cargill Inc., Tenkoz Inc., Winfield Solutions, LLC, and Univar Solutions, Inc. (the "Wholesaler Defendants"), and Defendants CHS Inc., Nutrien Ag Solutions Inc., Growmark Inc., Simplot AB Retail Sub, Inc., and Federated CoOperatives Ltd. (the "Retailer Defendants"), collectively have established a secretive distribution process that keeps Crop Inputs prices inflated at supracompetitive levels and, in furtherance of their conspiracy, denies farmers access to relevant market information, including transparent pricing terms that would allow comparison shopping and better-informed purchasing decisions, and including information about seed relabeling practices that would enable farmers to

know if they are buying newly developed seeds or identical seeds repackaged under a new brand name and sold for a higher price.

6.     The cost of Crop Inputs is increasing at a significantly faster rate than profits from farmers' crop yields. The skyrocketing Crop Inputs prices are causing farmers to take on significant operating debt and often forcing them into bankruptcy. Not surprisingly, American farmers who are critical to the nation's food supply are facing a crisis. Neither the cost increases nor the price disparities are attributable to any independent legitimate cause, such as weather or other factors.

7.     Beginning at least as early as 2014, the advancement of technology allowed for the launching of new ecommerce Crop Inputs sales platforms that increased price transparency to farmers. These platforms, including Farmers Business Network ("FBN") and Agroy, Inc., became successful with farmers by providing price comparison tools which allowed farmers to view what other farmers were paying for the same Crop Inputs.

8.     Viewing this success, Defendants conspired to boycott these ecommerce Crop Inputs sales platforms because of the threat they posed to Defendants' market position, power and price control. For example, the Manufacturer Defendants and Wholesaler Defendants agreed not to sell to ecommerce Crop Inputs sales platforms and enforced strict discipline on Retailer Defendants who failed to comply with the boycott. Defendants Syngenta, Bayer, BASF, and Corteva used audits and inspections of their authorized retailers to ensure that ecommerce Crop Inputs sales platforms were unable to obtain Crop Inputs from their authorized retailers.

9.     Defendants' boycott succeeded. As a result of Defendants' anticompetitive conduct, ecommerce Crop Inputs sales platforms such as FBN were unable to purchase Crop Inputs from Defendants. This was a devastating blow to these sales platforms and directly harmed farmers

by eliminating a lower-cost option for purchasing these Crop Inputs. Defendants, on the other hand, as the dominant manufacturers and sellers, benefitted from the lack of lower-cost options for farmers on these ecommerce platforms.

10.     As a direct and proximate result of their anticompetitive conduct, Defendants have maintained supracompetitive prices for Crop Inputs by denying farmers access to accurate pricing information and have injured farmers by forcing farmers to accept opaque price increases that drastically outweigh any increase in crop yields or market prices.

11.     Defendants' anticompetitive conduct is the subject of an ongoing investigation by the Canadian Competition Bureau ("CCB") and the United States Federal Trade Commission ("FTC").

12.     A Canadian federal court has found that there is sufficient evidence to require Defendants to also produce records concerning their coordinated anticompetitive conduct in the United States.

13.     The FTC is likewise investigating anticompetitive conduct in the Crop Inputs market.  At least one Defendant, Corteva, has been subpoenaed by the FTC—ordering it to submit documents related to Crop Inputs "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(d) and 1367 because this is a class action in which the amount in controversy exceeds $5,000,000 and some members of the proposed Class are citizens of a state different from some Defendants, and because Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.  The Court has further jurisdiction over this

action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  Plaintiffs seek actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by Defendants' conduct. Plaintiffs also seek injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).

15.     Venue is appropriate in this district and division because Plaintiffs have resided or transacted business within this district and division and Defendants reside or transact business within this district; and they transact their affairs and carry out interstate trade and commerce, in substantial part, in this district and/or have an agent and/or can be found in this district. Venue is also appropriate within this district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1391(b), (c) and (d).

16.     This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this district; (b) manufactured, shipped, sold, and/or delivered substantial quantities of Crop Inputs throughout the United States, including this district; (c) had substantial contacts with the United States, including this district; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this district. Additionally or in the alternative, this Court has jurisdiction pursuant to 18 U.S.C. § 1965(b) based on this Court having personal jurisdiction over one or more Defendant(s) pursuant to Fed. R. Civ. P. 4(k).

17.     Defendants' and their co-conspirators' conduct, as described herein, was within the flow of, was intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## TRADE AND COMMERCE

18.     The relevant market for this lawsuit is the market for Crop Inputs in the United States, including the manufacturing market for Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

19.     During the Class Period, each Defendant sold Crop Inputs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial District.

20.     During the Class Period, Defendants collectively controlled a majority of the market for Crop Inputs in the United States.

21.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused injury in the United States.

## PARTIES

**Plaintiffs**

22.     Plaintiff Mark Krieger is an Indiana resident who resided in the Southern District of Indiana during the Class Period, where he operated a family farm. Mr. Krieger purchased Crop Inputs from one or more Defendants in Indiana and Illinois during the Class Period both directly and indirectly for his own use in his farming operation and not for resale. Plaintiff suffered injury as a result of Defendants' conduct alleged herein.

23.     Plaintiff Krieger Family Farms, LLC is an Indiana Limited Liability Company and has maintained its principal place of business in Indiana at all relevant times. During the Class Period and while operating in Indiana and Michigan and purchasing Crop Inputs in Indiana and Illinois, Plaintiff Krieger Family Farms, LLC both directly and indirectly purchased one or more Crop Inputs, for its own use for its farming operation and not for resale, that was manufactured or

sold by one or more Defendants. Plaintiff Krieger Family Farms, LLC suffered injury as a result of Defendants' conduct alleged herein.

**Manufacturer Defendants**

24.     Defendant Bayer CropScience Inc. is a wholly owned subsidiary of Bayer AG headquartered in St. Louis, Missouri and incorporated in New York that develops, manufactures, and sells Crop Inputs in the United States. Bayer AG is a multinational pharmaceutical, chemical, and agriculture company. It organizes itself into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

25.     Defendant Bayer CropScience LP is a wholly owned subsidiary of Bayer AG headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

26.     Bayer CropScience Inc. and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division. Bayer Canada is a subsidiary of Bayer AG and therefore shares a common corporate parent with Bayer CropScience Inc. and Bayer CropScience LP.

27.     Defendant Corteva Inc. is a domestic corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States. Corteva Incorporated is a Delaware corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

28.     Defendant Pioneer Hi-Bred International, Inc. ("Pioneer") is an Iowa corporation headquartered in Johnston, Iowa, that develops, manufactures, and sells Crop Inputs in the United States. Pioneer is a wholly owned subsidiary of Corteva.

29.     Defendant BASF Corporation ("BASF") is headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States. BASF and its Canadian counterpart, BASF Canada, share a common corporate parent: BASF SE.

30.     Defendant Syngenta Corporation ("Syngenta") is the main U.S.-based operating subsidiary of Syngenta AG and is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

**Wholesaler Defendants**

31.     Defendant Cargill, Inc. ("Cargill") is a domestic corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler, AgResource Division, which sells and distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Cargill was an active wholesaler in the U.S. Crop Inputs industry, at least until it sold its crop inputs business to Agrium, Inc. in 2016. Cargill's Canadian subsidiary, Cargill Limited, is a subject of the Canadian Competition Bureau's investigation into anticompetitive conduct in the Canadian Crop Inputs market. Cargill holds itself out as a connected, global enterprise: "With 200 facilities across North America, and links to markets all over the world, we have the capacity as well as the expertise to connect growers with end users around the globe,"[1] Cargill also represents that it "offers U.S. and Canadian farmers a range of . . . crop inputs, and agronomic services . . . ."[2]

---

[1] *Agriculture*, CARGILL.CA, https://www.cargill.ca/en/agriculture (last visited Sept. 19, 2022).

[2] *North America Farmer Services*, CARGILL.COM, https://www.cargill.com/agriculture/north-america-farmer-services (last visited Sept. 19, 2022).

32.    Defendant Tenkoz Inc. ("Tenkoz") is one of the largest Crop Input distributors in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 700 retail locations and 85 wholesale locations around the country.[3] Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

33.    Defendant Winfield Solutions, LLC ("Winfield Solutions") is a domestic corporation headquartered in Arden Hills, Minnesota and incorporated in Delaware. Winfield Solutions is a Crop Input wholesaler and sells Crop Inputs in the United States. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield Solutions is also a major Crop Input retailer that operates as a cooperative owned by its members, which are 650 Crop Input retail businesses operating 2,800 retail locations throughout the United States and parts of Canada. Winfield Solutions and its Canadian counterpart, Winfield United Canada, have a common corporate parent: Land O'Lakes, Inc.

34.    Defendant Univar Solutions, Inc. ("Univar Solutions") is a domestic corporation headquartered in Illinois and incorporated in Delaware. Univar Solutions is a Crop Input wholesaler and sells Crop Inputs in the United States. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Univar Solutions Canada is a subsidiary of Univar Solutions, Inc.

---

[3] *Profile*, TENKOZ.COM, https://tenkoz.com/about/ (last visited Sept. 19, 2022).

**Retailer Defendants**

35.     Defendant CHS Inc. ("CHS") is one of the largest crop input wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick-and-mortar stores. CHS Inc. is incorporated and headquartered in the state of Minnesota and sells Crop Inputs in the United States.

36.     CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

37.     Defendant Nutrien Ag Solutions, Inc. ("Nutrien Ag Solutions") is both a Crop Input wholesaler and the largest Crop Input retailer in the United States. It sells Crop Inputs to farmers throughout the United States and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien Ag Solutions is incorporated in Delaware and has its principal place of business in Colorado. Nutrien Ag Solution is the retail division of the world's largest crop inputs company.[4]

38.     Defendant GROWMARK, Inc. d/b/a Farm Supply or FS ("Growmark") is a large Crop Input retailer headquartered in Illinois with brick-and-mortar locations throughout the Midwestern United States and sells Crop Inputs in the United States. Growmark is incorporated in Delaware. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

39.     Defendant Simplot AB Retail Sub, Inc. f/k/a Pinnacle Agriculture Distribution, Inc. ("Simplot") is a large Crop Input wholesaler and retailer that operates 135 retail locations across

---

[4] *About Us*, NUTRIEN AG SOLUTIONS, https://www.nutrienagsolutions.com/about-us (last visited Sept. 19, 2022).

27 states and sells Crop Inputs in the United States. Simplot is headquartered and incorporated in Mississippi. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

40.     Defendant Federated Co-operatives Ltd. ("Federated") is a large Crop Input retailer. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the Crop Input market.

## FACTUAL ALLEGATIONS

41.     Farmers in the United States are being squeezed on both ends, currently experiencing drastically increasing operating expenses while revenue and profits from their crop yields remain stagnant. For example, between 1995 and 2011, the cost of growing soybeans and corn tripled while yields for those same crops rose by only 18.9% and 29.7%, respectively.

42.     This trend has continued in recent years. One study found that seed, fertilizer, and pesticide costs were 32% of crop revenue between 1990 and 2006, 36% of revenue between 2006 and 2015, but 48% of crop revenue in 2015.[5] In a 2018 survey, 80% of farmers reported that their costs continued to increase, and many farmers cannot pay their outstanding operating debts— estimated at well over $400 billion in 2019. The rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

---

[5] Schnitkey, G. and S. Sellars, "Growth Rates of Fertilizer, Pesticide, and Seed Costs over Time." *farmdoc daily* (6):130, Department of Agricultural and Consumer Economics, Univ. of Ill. at Urbana-Champaign, July 12, 2016, https://farmdocdaily.illinois.edu/2016/07/growth-rates-of-fertilizer-pesticide-seed-costs.html (last visited Sept. 19, 2022).

43.     The rate of cost increases is not attributable to any legitimate cause, as research and development expenditures have decreased over the past several years. Instead, the increases are a result of unjustifiably inflated, supracompetitive prices because of Defendants' anticompetitive conduct, including their group boycott of ecommerce Crop Inputs sales platforms such as FBN.

44.     Defendants purposefully structured the Crop Inputs market to be both secretive and opaque to obscure pricing data and product information that farmers need to make informed purchasing decisions. Because farmers lack the objective information and data needed to evaluate their purchases, they are forced to pay higher prices for Crop Inputs than a competitive market would offer. On top of this, farmers are unable to buy Crop Inputs without paying for the unnecessary overhead of brick-and-mortar retailers.

45.     The Manufacturer Defendants, who develop and produce between 75% to 90% of name brand Crop Inputs, guard their product prices from consumers. The Manufacturer Defendants allow their products to be sold only by (a) wholesalers, including the Wholesaler Defendants, (b) retailers owned or operated by the manufacturer, and (c) licensed "authorized retailers" such as the Retailer Defendants. Absent an agreement among the Manufacturer Defendants to boycott ecommerce Crop Inputs sales platforms, any single Manufacturer Defendant would have benefited by selling Crop Inputs to FBN or another ecommerce Crop Inputs sales platform as an additional chain of distribution.

46.     Through the contracts granting "authorized retailer" licenses, the Manufacturer Defendants require strict confidentiality and prohibit "authorized retailers" from disclosing to their customers the manufacturers' prices or any incentives, rebates, or commissions offered by the manufacturers to the authorized retailers. This lack of price transparency increases the Manufacturer Defendants' profits. As a result, Manufacturer Defendants have an incentive to

collude with each other and with wholesalers and retailers to prevent actions (such as the entry of ecommerce Crop Inputs sales platforms like FBN) that would result in price transparency.

47.     Taking advantage of farmers' lack of access to objective pricing or performance data, Manufacturer Defendants take seeds that have long been on the market and simply repackage them under a new brand name so that they can be sold at a higher price. This practice causes farmers to overpay for seed that could have been purchased for less from a different brand or other source, and/or to have less genetic diversity in seeds across their farms than they anticipated.

48.     At the retail level, pricing is similarly opaque and obscured. Wholesalers' contracts with authorized retailers contain strict confidentiality provisions, prohibiting retailers from disclosing the price paid to the wholesaler for Crop Inputs or the price at which retailers sell those exact same Crop Inputs to other farmers. In addition, retailers bundle the sale of Crop Inputs with other services, such as spraying or applying chemicals, which further obscures the individual cost of any Crop Input or bundled service.

49.     Since 2014, ecommerce Crop Inputs sales platforms sought to compete with the opaque and inefficient wholesale and retail systems by offering modernization, increased price transparency, and direct access to Crop Inputs.

50.     Initially, ecommerce Crop Inputs sales platforms were successful. For example, more than 12,000 farmers signed up for FBN's service that provided objective performance data on Crop Inputs, and 6,000 farmers signed up for FBN's electronic sales platform.

51.     Wholesaler and Retailer Defendants recognized the threat posed by these ecommerce Crop Inputs sales platforms to their market position, power and profit margins. A report published by CoBank, a cooperative partly owned by Crop Inputs retailers and a major

lender to grain cooperatives, explained that price transparency would enable farmers to negotiate with Crop Inputs retailers and decrease their profit margins:

> First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices.
>
> These e-commerce sites provide farmers with several sources of product price information that are just clicks away. Farmers can then leverage that information in negotiations with local brick-and-mortar retailers. Traditional ag retailers that bundle products and services together under the product price are losing some customers to e-commerce sites that provide only the product. The e-commerce channel allows cost-sensitive farmers to eliminate service costs like custom application and product warranties.[6]

52.     In 2016, Defendant CHS sent a letter to farmers discouraging them from using FBN by falsely claiming that although FBN would be able to offer the same products at lower costs, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."

53.     Despite claims that FBN is not in touch with the Farm Belt, eighty to ninety percent of FBN's employees are located in rural communities in South Dakota, Montana, Alberta, and Australia. They have dozens of facilities around the United States, including distribution centers and warehouses, and hundreds of farmer dealers in communities. As FBN co-founder Charles Baron explained to *Chief Executive*: "So when [competitors] say FBN isn't local, that's absurd. Besides, the most important 'local business' in the farm system is the farmer's farm; it's the core economic engine. And that's where we are."[7]

---

[6] *Ag Retailers Look to Retool Strategy for Success in the Era of E-Commerce*, GLOBENEWSWIRE, https://rss.globenewswire.com/newsrelease/2019/02/20/1738614/0/en/Ag-Retailers-Look-to-Retool-Strategy-for-Success-in-the-Eraof-E-Commerce.html (last visited Sept. 19, 2022).

[7] Dale Buss, "Farmers Business Network Plows New Ground," *Chief Executive* (Dec. 23, 2020), https://chiefexecutive.net/farmers-business-network-plows-new-ground/ (last visited Sept. 19, 2022)

54.     FBN does not sell farmers' data to other companies and only shares data if directed to by farmers.[8]

55.     CropLife America is a trade association made up of major Crop Inputs manufacturers, wholesalers, and retailers and serves as an ideal vehicle for collusion. Only manufacturers and distributors of Crop Inputs are eligible for full membership in CropLife America. CropLife America's board of directors is chaired by an executive from one of the Manufacturer Defendants, currently Paul Rea from BASF and previously Suzanne Wasson from Corteva. The current board also includes an executive from Winfield Solutions' parent company, Land O'Lakes. For the 2016-19 term, CropLife America's board of directors included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. In addition, Syngenta Crop Protection is a member of CropLife America. The board is exclusively composed of representatives from large Crop Inputs manufacturers, distributors, and retailers, making it an ideal vehicle for collusion. There is not a single representative for farmers or farmer groups on CropLife America's board of directors despite CropLife America's expressed mission to "help ensure growers and consumers have the technologies they need to protect crops, communities, and ecosystems from the threat of pests, weeds, and diseases in an environmentally sustainable way." Defendants used CropLife America as an instrument to promote their antagonism to and boycott of these ecommerce Crop Inputs sales platforms, such as FBN.

56.     CropLife America publishes the trade publication CropLife Magazine, which repeated the concerns expressed by CoBank about the threat posed by ecommerce Crop Inputs sales platforms to Crop Inputs retailers' business. In February 2016, CropLife stated it was "concerned that the retailer could be disintermediated—i.e., that electronic platforms would 'cut

---

[8] FBN Terms of Service, FBN.COM https://www.fbn.com/page/show/tos (last visited Sept. 19, 2022)

out the middle man'—allowing growers to find product conveniently and at a lower market price," and decried the "devil known as 'price transparency,'" stating that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

57.    CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts"—clearly identified the threat posed by ecommerce Crop Inputs sales platforms to retailers and wholesalers at its 2017 annual meeting. CropLife's coverage of the event reported that "three letters . . . continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how FBN had negatively affected their business during 2017 by cutting into their already slim margins on various products." One PACE Council member observed, "I think it would be crazy, stupid to ignore [FBN]. Even if they end up going away, the business model they've introduced to agriculture will probably be tried by someone else."[9]

58.    In February 2018, CropLife reported on a local "huge price war in chemicals" in Iowa in 2017 as a result of FBN competing in the market. A retailer competing with FBN urged that "'ag retailers need to get proactive' in dealing with the threat of disintermediation." Another retailer noted that "as we get more competitive with the FBNs of the world, we'll obviously have to cut back on services and support (at times). But what concerns me is when . . . the legal

---

[9] Eric Sfiligoj, *Farmers Business Network: 'Crazy, Stupid' . . . to ignore*, CROPLIFE, https://www.croplife.com/editorial/farmers-business-network-crazy-stupid-ignore/ (last visited Sept. 19, 2022).

implications of that is you are a big business now and the regulatory burden becomes more significant."

59.     When the consolidation and anti-competitive effects of the Crop Inputs market have been called into question, Defendants have regularly coordinated through CropLife America to fight threats to their market power. For example, when Senator Elizabeth Warren targeted Defendants Bayer, Corteva, and Syngenta for recent mergers consolidating the Crop Inputs industry and squeezing out small family farms, CropLife America spoke out on behalf of Defendants to justify the consolidation. Similarly, when the Ninth Circuit concluded that EPA's registrations of Manufacturer Defendants' dicamba pesticide products did not adequately consider the products' anti-competitive effects, CropLife America wrote on behalf of its member companies, including Defendants, in support of the EPA decision.

60.     The Agricultural Retailers Association ("ARA") is a non-profit trade association that represents the interests of agricultural retailers and distributors across the United States. Its mission is to "support its members in their quest to maintain a profitable business environment . . . ." The ARA's board of directors is currently chaired by Rod Wells of Growmark and includes board members from Defendants Nutrien, CHS, Winfield Solutions, Corteva, Growmark, Bayer, BASF, and Syngenta, *inter alia*.

61.     ARA hosts an annual "Conference & Expo" where more than 650 ag retailers attend, representing 85% of the industry.  These conferences provide abundant opportunities for Defendants to coordinate and collude to eliminate price transparency and preclude innovative ecommerce solutions from disrupting the traditional agricultural supply chain. Indeed, a "Roman Coliseum-esque clash" between FBN and an ag retail consultant (Steve Watts of Farrell Growth Group ("FGG")) was the "main event" at the 2017 annual conference, where Mr. Watts announced

his belief that it was time for the Crop Inputs retailers to take steps to affirmatively combat the intrusion of e-commerce entities.  The ensuing topics of conversation amongst ARA members once FBN left the conference provided ample opportunity to build upon Mr. Watts' explicit calls to action.

62.     FGG provides other opportunities for coordination and collusion among Crop Input retailers and wholesalers.  Specifically, FGG provides benchmarking information for ag retail companies to "analyze industry trends along with retail performance side by side with industry averages… at an individual company level"[10] – not unlike benchmarking in the meat industry that launched federal criminal charges and a litany of securities and antitrust lawsuits. FGG recently announced its expansion of this aspect of its business in a partnership with Winfield United Canada. *Id.*

63.     FGG's benchmarking service is designed to "provide private one on one interpretation and apples vs. apples analysis of each participant's reports in meetings at participant's offices. . . ."[11] FGG's benchmarking program manager Kelly Farrell claims a "wellrun benchmarking program" must consider the following:

a.   Financial statements must be restated to a comparable format. If the company performing the benchmarking simply compiles the financial statements of the group and does not make adjustments *to ensure each company's financial statements are stated on a comparable basis*, the final product will be of limited value. This approach requires more time and expense but is truly essential if you are looking for meaningful comparisons.

---

[10] *See Farrell Growth Group Expands Benchmarking Services into Canada with Winfield United Canada* (Mar. 29, 2021), https://www.farrellgrowth.com/farrell-growth-group-expands-benchmarkingservices-with-winfield-united-canada (last visited Sept. 19, 2022); *see also*, Kelly Farrell, *Good Fortune Is Often Disguised as Good Execution*, THE SCOOP (Apr. 14, 2021), https://www.thedailyscoop.com/news/retail-business/good-fortune-often-disguised-good-execution ("Farrell Growth Group's MIX program compares financial statements of top ag retailers and measures overall performance as pretax income as a percentage of sales.") (last visited Sept. 19, 2022).

[11] *See Management Information Excellence (MIX)*, FARRELL GROWTH GROUP, https://www.farrellgrowth.com/management-information-excellence-mix/ (last visited Sept. 19, 2022).

b. Be selective. You need to be confident in the abilities of the company doing the benchmarking. In addition to knowledge of accounting principles and the benchmarking process, it is also ideal the firm understands your industry.

c. Confidentiality is essential! You must have confidence your financial statements are being handled with care. Consider having the benchmarking done by a neutral source rather than someone with a vested interest in your business.

d. Know the companies in your comparison group. There is certainly value in seeing *where you stand within a group of all your peers.* But if you are looking to be the best, then you will want to *compare yourself to the best.*

e. Consider a benchmarking service that includes a peer-to-peer meeting. *Discussing with peers how they achieve results* and implement intelligence into the business can help you accomplish the next level of performance.[12]

64.     FGG studies shared data through its benchmarking service marketed as "MIX," which stands for "Management Information Excellence." Having established a partnership with FGG, wholesale crop input seller Winfield United Canada delivers MIX benchmarking insights to retailers through its "The Academy" platform. Winfield United Canada, along with Defendant, Winfield Solutions, is owned by Land O'Lakes, Inc.

65.     As noted in a Bloomberg interview with Peter Carstensen, a law professor and former Justice Department antitrust lawyer, detailed benchmarking analyses can "run afoul of antitrust law… when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion… because it allows co-conspirators to make sure they're all following through on the agreement. 'This is one of the ways you do it. You make sure that your co-conspirators have the

---

[12] Kelly Farrell, *Create a Continual Improvement Strategy*, THE SCOOP (Jan. 19, 2021), http://digitaledition.qwinc.com/publication/?i=691594&article_id=3868026&view=articleBrows er&ver=html5 (emphasis added) (last visited Sept. 19, 2022).

kind of information that gives them confidence—so they can trust you, that you're not cheating on them,' he says. 'That is what creates stability for a cartel.'"[13]

66.     Thus, benchmarking services, including those offered by FGG to agricultural retailers, supply market participants with private competitor data necessary to coordinate and manipulate pricing and stabilize their anticompetitive scheme.

67.     Over the last decade, CropLife America reported that it has improved cooperation and camaraderie with the Agricultural Retailers Association.

68.     The Retailer Defendants and the Wholesaler Defendants knew that retaining their market positions, power and profit margins depended on excluding ecommerce sales platforms from the market, so they conspired to eliminate the platforms' product supply. To do so, the Retailer and Wholesaler Defendants induced the Manufacturer Defendants—who rely on the Wholesaler and Retailer Defendants to recommend and sell their products to farmers—to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms. The Retailer Defendants and Wholesaler Defendants are among the largest retailers and wholesalers of Crop Inputs in the United States and, therefore, the Manufacturer Defendants knew they risked the loss of substantial sales if they did not agree to the boycott.

69.     Because the Manufacturer Defendants compete with each other in Crop Inputs product offerings, the Retailer and Wholesaler Defendants have the ability to transfer non-trivial amounts of sales from one manufacturer to another. Although the Manufacturer Defendants produce Crop Inputs that have different brand names, they all produce overlapping Crop Inputs that serve the same purpose and/or contain the same active ingredients. For example, herbicides

---

[13] Christopher Leonard, *Is the Chicken Industry Rigged?*, BLOOMBERG BUSINESSWEEK (Feb. 15, 2017), https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged (last visited Sept. 19, 2022).

are grouped by their "mode of action," and the Manufacturers Defendants produce different herbicides that directly compete with one another within those mode of action groups. For example, Defendant Syngenta's Flexstar® herbicide and Defendant BASF's Sharpen® powered by Kixor® herbicide both use the same "mode of action", both are PPO Inhibitors (Group 14), and directly compete. Similarly, each Manufacturer Defendant offers corn seeds (and several other Crop Inputs) that directly compete with one another. Therefore, if a Manufacturer Defendant did not agree to the boycott, that manufacturer would risk the loss of substantial sales.

70.     In 2016, Defendant Bayer formed an internal task force to study the long-term competitive impact of FBN's ecommerce Crop Inputs sales platform.

71.     But Defendants' actions were not internal or unilateral. The Manufacturer Defendants agreed with the Wholesaler and Retailer Defendants to cut off the supply of Crop Inputs to ecommerce Crop Inputs sales platforms and Defendants initiated a joint boycott. When ecommerce Crop Inputs sales platforms attempted to purchase Crop Inputs from the Manufacturer and Wholesaler Defendants, they all refused and offered only pretextual excuses for their refusal.

72.     For example, when Syngenta's Head of Crop Protection Sales in the United States, Michael Boden, found out that a small number of branded Crop Inputs had been sold on ecommerce platforms in violation of Defendants' boycott, he falsely claimed that ecommerce Crop Inputs sales platforms would deliver counterfeit products and that, "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

73.     Retailers who failed to comply with the group boycott were penalized by the Defendants. For example, in 2018, Syngenta initiated an audit of its authorized retailers after

learning that some retailers had sold Crop Inputs product to ecommerce Crop Inputs sales platforms despite the boycott to identify and punish the retailers who made those sales.

74.     Defendants Bayer, BASF, and Corteva utilize mandatory language in their form contracts with authorized retailers that permit audits of authorized retailers' books and records and on-site inspections at any time. Defendants Bayer, BASF, and Corteva used these contractual provisions to ensure that ecommerce Crop Inputs sales platforms could not purchase name brand Crop Inputs from an authorized retailer.

75.     The impact of Defendants' boycott extended past branded products to generic products (*i.e.*, Crop Inputs sold by non-Defendant manufacturers after the Manufacturer Defendants' patents expire). In a 2018 Forbes article, the CEO of a generic chemical products company stated it was wary of supplying ecommerce Crop Inputs sales platforms because it could anger existing sales channels, but that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."[14]

76.     As noted above, the Defendant Wholesalers and Retailers collectively constitute a significant share of the sales of the Manufacturer Defendants, and they were willing to leverage this fact against the Manufacturer Defendants when necessary.

77.     For instance, in 2018, FBN purchased Yorkton Distributors ("Yorkton"), a Canada-based retailer with longstanding supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield. Those agreements would have provided FBN with inventory of Crop Inputs

---

[14] Amy Feldman, *This Scrappy Startup Wants To Save Family Farms. But Big Ag Is Fighting Back*, FORBES (June 29, 2018), https://www.forbes.com/sites/amyfeldman/2018/06/19/farming-ag-agriculture-farmers-business-network/?sh=5b9c8b936312 (last visited Sept. 19, 2022).

to sell to farmers. Indeed, FBN had inquired with manufacturers prior to purchasing Yorkton about these agreements and "no one indicated they'd be disfavorable."[15]

78.     However, the Wholesaler and Retailer Defendants threatened to retaliate against the Manufacturer Defendants if they honored the agreements. As a result, the Manufacturer and Wholesaler Defendants collectively agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts within a few months of FBN's March 2018 acquisition of Yorkton.

79.     After FBN's purchase, the Wholesaler and Retailer Defendants put pressure on the Manufacturer Defendants to stop supplying Crop Inputs to Yorkton. On March 31, 2018, four days after FBN announced its purchase of Yorkton, Federated warned that the new competitor would upend their business models, writing, "[h]ow our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional retailing peers across Western Canada." Other market participants have confirmed that this email was also circulated outside of Federated to one or more other industry participants.

80.     After FBN purchased Yorkton, Defendant Univar sent an email to retailers dated April 6, 2018, declaring that it had informed FBN that Univar would cease to conduct business with FBN after July 31, 2018. Univar's email further stated that:

> "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing. . . . If anyone thinks socialism is going to feed the world just call Russia first and see how that worked out."

Finally, Univar's email criticized FBN's model of transparency, stating that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering."

---

[15] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850 (last visited Sept. 19, 2022).

81.     Defendant Univar also sent an email notifying its manufacturer suppliers of its decision not to do business with FBN and provided false and misleading talking points to justify its decision on April 6, 2018

82.     Faced with threats of retaliation from the Wholesaler Defendants and Retailer Defendants, the Manufacturer and Wholesaler Defendants agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts. This all occurred within only a few months of the March 2018 acquisition by FBN and caused Yorkton to lose two-thirds of its branded products.[16] Bayer (on June 15, 2018), Corteva (on August 27, 2018), and Cargill (on August 3, 2018) informed FBN they would no longer sell Crop Inputs, including seeds and pesticides, or sell only limited quantities to Yorkton. Winfield also advised that it would not supply FBN with Crop Inputs on May 8, 2018.

83.     FBN co-founder Charles Baron stated that the response by the Canadian industry after its purchase of Yorkton was similar to the United States' industry response when FBN first launched in 2014, and that "[t]hese actions caused serious harm and really blocked FBN from being able to provide and fulfill a lot of the basic services we provide growers."[17]

84.     The Defendants' boycott of FBN was successful and forced FBN to begin developing its own products that it could sell to farmers through its online marketplace.

85.     The original online marketplace for agricultural chemicals, FarmTrade (formerly known as XSAg.com until summer 2014), was decried by CropLife as a "nasty body blow" and a "draconian" mechanism of cutting out retailers altogether. CropLife characterized FarmTrade as "[a] new Website… [which] offered a virtual playing field for the buying and selling of crop

---

[16] *Id.*

[17] Sean Pratt, *Competition Bureau investigates major crop input makers, sellers*, THE WESTERN PRODUCER (Feb. 13, 2020), https://www.producer.com/news/competition-bureau-investigates-major-crop-input-makers-sellers/ (last visited Sept. 19, 2022).

protection products online. Anyone in agriculture could list a product and price offer online and sell to any other entity. We, along with many of you, were concerned that the retailer could be disintermediated – a fancier and less draconian way of saying 'cut out the middle man' – allowing growers to find product conveniently and at a lower market price."[18] FarmTrade's online platform was swiftly combated by crop protection product manufacturers and others in the distribution channel, who "corrected" the "devil" of price transparency, ending the "unnerving and unhappy time." *Id.* While FarmTrade continues to operate, like FBN, it is limited to selling mostly chemicals unencumbered by the restrictions imposed on brand-name chemicals and its business has largely "fall[en] by the wayside."[19]

86.     As a result of the Defendants' coordinated boycott, farmers are and have been deprived of the opportunity to purchase Crop Inputs at transparent, competitive prices from ecommerce Crop Inputs platforms. Instead, farmers are forced to continue paying artificially inflated prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements and seed relabeling practices.

87.     Defendants' actions as alleged in this Complaint are against their independent economic self-interests. Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of ecommerce Crop Inputs sales platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott could only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have

---

[18] Paul Schrimpf, *Crop Input Selling: Return of the Price List*, CROPLIFE (Feb. 2, 2016), https://www.croplife.com/editorial/paul-schrimpf/crop-input-selling-return-of-the-price-list/ (last visited Sept. 19, 2022).

[19] Matthew J. Grassi, *What Does FBN's Latest Attempt at Disintermediation Really Mean for Ag Retailers?*, CROPLIFE (Feb. 6, 2017), https://www.croplife.com/iron/what-does-fbns-latest-attempt-at-disintermediation-really-mean-for-ag-retailers/ (last visited Sept. 19, 2022).

established itself as the primary supplier to ecommerce platforms and grown its customer base at the expense of its competitors by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

88.     For these reasons, absent an agreement among them, Defendants' actions were against their independent economic self-interest. For any one or more Defendants to provide Crop Inputs to ecommerce platforms presented a significant business opportunity because those platforms: (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profit by reducing or eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

89.     Certain Defendants are recidivist antitrust violators. Competition experts have noted that past experience with participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists," in which BASF and Bayer are among the top five leading antitrust recidivists. Corteva is also on the list and is among the top forty leading antitrust recidivists.

90.     Economists, retailers, and customers alike recognize that ecommerce retail is distinct from traditional brick-and-mortar retail. Ecommerce has unique characteristics, including the marketing and distribution of products. Economists recognize that the "[i]nternet represents a

fundamentally different environment for retailing from traditional retailing."[20] An online channel has different characteristics than a physical channel.[21] Ecommerce has a superior method of transmitting information, effective asynchronous communication, greater flexibility in dealing with information, with far greater interactivity and search capability.[22] Ecommerce retail businesses avoid costs associated with physical store locations.[23] Consumers benefit from greater "information about the available goods and services; an improvement in access to these goods; and the ability to customize goods to fit the tastes of buyers."[24] Economists recognize that the physical location of the business operating within ecommerce becomes less relevant because the ecommerce market "facilitates production and distribution across borders . . . and can assist in opening markets that were previously closed."[25] The lower transaction and production costs facilitate easier entry into the market and increase competition.[26] Demand side preferences also make online retailing unique in terms of certain factors such as convenience and price.[27]

---

[20] Forsythe, S.M., & Shi, B. (2003), *Consumer patronage and risk perceptions in Internet shopping*, Journal of Business Research 56, 867–875 at 874.

[21] Katawetawaraks, C., & Wang, C. H. (2011), *Online Shopper Behavior: Influences of Online Shopping Decision*, Asian Journal of Business Research, 1(2), 66-74.

[22] Severin Borenstein and Garth Saloner, *Economics and Electronic Commerce*, JOURNAL OF ECONOMIC PERSPECTIVES, Vol. 15, No.1 (Winter 2001) at 5, https://www.gsb.stanford.edu/faculty-research/publications/economics-electronic-commerce?pid= (last visited Sept. 19, 2022); *see also* David VanHoose, ECOMMERCE ECONOMICS (Routledge 2nd ed. 2011), https://www.routledge.com/eCommerce-Economics/VanHoose/p/book/9780415778985.

[23] *Id.* at 5-6.

[24] *Id.* at 6-7.

[25] Andrew D. Mitchel, *Towards Compatibility: The Future of Electronic Commerce within the Global Trading System*, J Int Economic Law (2001) 4 (4): 683.

[26] *Id.*

[27] Tracey Wallace, The 2018 Omni-Channel Retail Report: Generational Consumer Shopping Behavior Comes Into Focus, https://grow.bigcommerce.com/rs/695-JJT-333/images/report-2018-omnichannel-buying.pdf (last visited Sept. 19, 2022); *see also* Isabel P. Enrique and Sergio Romàn, *The Influence of Consumers' Cognitive and Psychographic Traits on Perceived Deception: A Comparison Between Online and Offline Retailing Contexts*, J Bus Ethics (2014) 119:405–422 (examining the role of several consumers' cognitive and psychographic traits in their perception of retailers' deceptive practices (perceived deception) and the different effects on perceived deception associated with online vis- à-vis in-

91.     Defendants recognize that ecommerce sales platforms result in considerable benefits to consumers, most importantly transparency.[28] Defendants have not only boycotted independent ecommerce Crop Inputs sales platforms but are also developing and launching their own ecommerce platforms to trap farmers into their opaque pricing system.[29]

92.     The CCB is formally investigating Defendants' Canadian counterparts for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The CCB inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly owned subsidiary Monsanto Canada ULC in the seed and crop protection markets, and whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

93.     On February 11, 2020, a Canadian federal court granted in full *ex parte* applications made by Canada's Commissioner of Competition for the production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Limited, BASF Canada Inc., Bayer CropScience Inc. and its wholly owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices. Over Defendants' objection, the Canadian federal court found sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well.

---

store shopping, indicating that they need to be considered as distinct experiences for the customer).

[28] Paul Schrimpf and Jackie Pucci, *Online Sales Find Their Niche in Ag Retail*, CROPLIFE, https://www.croplife.com/crop-inputs/online-sales-find-their-niche-in-ag-retail/ (last visited Sept. 19, 2022) ("[T]he biggest challenge for retailers was price transparency.").

[29] *See id.*

94.     The United States Department of Justice is monitoring the Competition Bureau's investigation and is deciding whether to launch its own investigation into Defendants' concerted refusal to supply electronic platforms with Crop Inputs. The Competition Bureau noted that the Department of Justice's civil investigation into BASF Corporation had uncovered records of its views of the potential competitive significance of Farmers Business Network in the United States. It also noted that merger review documents of Bayer CropScience LP indicate a substantive consideration of FBN in the United States and its potential competitive significance.

95.     FTC is also investigating potential anticompetitive conduct in the Crop Inputs market. At least one Defendant, Corteva, has received a subpoena from the FTC. On May 26, 2020, the FTC issued a subpoena to Defendant Corteva, directing it to submit documents pertaining to potential anticompetitive conduct with respect to Crop Inputs. Corteva confirmed in a 10-Q filing that the FTC's subpoena required it "to submit documents pertaining to its crop protection products generally, as well as business plans, rebate programs, offers, pricing and marketing materials specifically related to its acetochlor, oxamyl and rimsulfuron and other related products in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## ANTITRUST INJURY

96.     Defendants' anticompetitive conduct has had the following effects, among others:

      a.  Price competition has been restrained or eliminated with respect to Crop Inputs;

      b.  The prices of Crop Inputs have been fixed, raised, stabilized, or maintained at artificially inflated levels;

    c.   Purchasers of Crop Inputs have been deprived of the benefits of free and open competition; and

    d.   Purchasers of Crop Inputs, including Plaintiffs, paid artificially inflated prices.

97.    Throughout the Class Period, Plaintiffs and members of the Class and sub-class purchased Crop Inputs in the United States, for their own use and not for resale at supracompetitive prices, which were manufactured or sold by Defendants.

98.    It is well recognized that in a multi-level chain of distribution, such as exists here, an overcharge is felt throughout the chain of distribution. As noted antitrust scholar Professor Herbert Hovenkamp stated in his treatise, <u>Federal Antitrust Policy, The Law of Competition and Its Practice</u> 564 (1994):

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below.  For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

99.    The purpose of the Defendants' conspiratorial and unlawful conduct was to fix, raise, stabilize, and/or maintain the price of Crop Inputs.

100.    As a direct and proximate result of the alleged violations of antitrust laws, Plaintiffs and Class members have sustained injury to their business or property, having paid higher prices for Crop Inputs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount to be determined

by a jury on competent proof. This is an antitrust injury of the type that the antitrust laws were intended to punish and prevent.

## CLASS ALLEGATIONS

101.    Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3) on behalf of the following Class and Subclass, seeking injunctive relief and damages pursuant to federal law on behalf of the Nationwide Class, damages on behalf of the Direct Purchaser Damages Sub-Class pursuant to federal law, and damages on behalf of the Indirect Purchaser and State Law Damages Sub-Class pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states identified herein:

**Nationwide Class (the "Class"):**

All persons and entities in the United States and its territories who purchased, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period.

**Direct Purchaser Damages Sub-Class:**

All persons and entities in the United States and its territories who purchased from a Defendant, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period.

**Illinois Indirect Purchaser and State Law Damages Sub-Class:**

All persons and entities in the United States and its territories who purchased from a retailer in Illinois other than a Defendant, for their own use and not for resale, a Crop Input manufactured by a Manufacturer Defendant during the Class Period.

102.    Specifically excluded from the Class and sub-class are the following:

   a.   Persons or entities that purchased Crop Inputs solely for resale;

    b.  Defendants;

    c.  The officers, directors, or employees of any Defendant;

    d.  Any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant;

    e.  Any federal, state governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff;

    f.  Any juror assigned to this action; and

    g.  Any co-conspirator identified in this action.

103.   **Numerosity**. Because such information is in the exclusive control of Defendants, Plaintiffs do not know the exact number of members of the Class or sub-classes. Due to the nature of the trade and commerce involved, Plaintiffs believe that there are thousands, if not tens of thousands, of members in the Class, and in each of the sub-classes, and that they are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members would be impracticable. Class treatment is the superior method for fairly and efficiently adjudicating this controversy.

104.   **Class Identity**. The above-defined Class and sub-classes are readily identifiable and for which records should exist.

105.   **Typicality**. Plaintiffs' claims are typical of other class members' claims because they were injured through Defendants' uniform misconduct and paid supracompetitive prices for Crop Inputs. Accordingly, by proving their own claims, Plaintiffs will necessarily prove the other class members' claims.

106.   **Common Questions Predominate**. Common legal and factual questions exist as to all Class members. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which was generally applicable to the Class and sub-classes as a whole. These questions include but are not limited to the following:

a.  Whether Defendants engaged in a combination or conspiracy amongst themselves to fix, raise, maintain, and/or stabilize the prices of Crop Inputs in the United States;

b.  The identity of additional participants in the alleged combinations and conspiracy, if any;

c.  The duration of the alleged combination or conspiracy and nature of the acts carried out by Defendants in furtherance of the combination or conspiracy;

d.  Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

e.  Whether the alleged combination or conspiracy had the effect of artificially inflating the price of Crop Inputs sold in the United States during the Class Period;

f.  Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws;

g.  Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and Class members, thereby entitling Plaintiffs and Class members to disgorgement of all benefits derived by Defendants;

h.  Whether Defendants' conduct caused injury to the members of the Class and sub-classes;

i.  Whether Defendants took actions to conceal their unlawful conspiracy;

j.  The appropriate injunctive and related equitable relief; and

k.  The appropriate measure and amount of damages to which Plaintiffs and other Class members are entitled.

107.   **Adequacy**. Plaintiffs can and will fairly and adequately represent and protect the interests of members of the Class and sub-classes and have no interests that conflict with or are antagonistic to those of the Class or sub-classes.  Moreover, Plaintiffs' attorneys are experienced and competent in antitrust and class action litigation.

108.   **Superiority**. Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because: among other things, such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

109.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

110.   Defendants have acted on grounds generally applicable to the Class and subclasses, thereby making final injunctive relief appropriate with respect to the Class and sub-classes as a whole.

## THE APPLICABLE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

111.   Any applicable statute of limitations for Plaintiffs and the Class and sub-classes has been tolled and/or Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' fraudulent concealment of the conspiracy.

112.    First, group boycotts and other antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants and their co-conspirators engaged in secret conspiracies that did not reveal facts that would put Plaintiffs or the Class and sub-class on inquiry notice that there was a conspiracy to fix prices of Crop Inputs, and effectively and affirmatively fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Class and subclass.

113.    In addition, Defendants acted affirmatively to conceal their conspiracy. As discussed above, Defendants have structured the market for Crop Inputs to maximize opacity to deny farmers access to pricing data and product information that farmers need to make informed decisions about Crop Inputs purchases. The Defendants use confidentiality provisions in their contracts to restrict disclosure of the prices of Crop Inputs. Defendants also employ seed relabeling and bundling to further prevent farmers, including Plaintiffs and the Class and sub-classes, from accessing pricing data and information about the Crop Inputs market.

114.    As a result, Plaintiffs and Class members had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiffs and members of the Class and subclasses did not discover, nor could have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the Canadian Competition Bureau launched its inquiry and issued subpoenas in February 2020, or until Defendant Corteva's September 2020 disclosure that the FTC had subpoenaed Corteva for documents "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

115.    Additionally, and in the alternative, Defendants' anticompetitive acts are continuing violations of the Sherman Act and accordingly each purchase by Plaintiffs at supracompetitive prices re-starts the statute of limitations. Defendants' anticompetitive conduct

began as early as January 1, 2014 and continues through the present. As a direct result of Defendants' unlawful conduct throughout the Class Period, Plaintiffs and Class, and Sub-Class members paid artificially inflated prices for Crop Inputs throughout the Class Period. Defendants' statements and actions described herein demonstrate that they continued to meet during the Class Period in furtherance of the conspiracy. Their meetings were overt acts that began a new statute of limitations because they served to further the objectives of the conspiracy. In this manner, Defendants' new overt acts were more than the inertial consequences of Defendants' initial violation. Rather, their acts were new and independent acts that perpetuated their agreement and kept it current with market conditions. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs, Class, and Sub-Class members.

116.    Additionally, and in the alternative, any limitations period applicable to the claims of the Plaintiffs herein have been tolled by the commencement of the complaints including them as putative class members in *In re Crop Inputs Antitrust Litigation*, Case No. 4:21-md-02993-SEP, MDL No. 2993 (E.D. Mo.).

## CLAIMS FOR RELIEF

### COUNT I

**Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**On Behalf of the Nationwide Class (For Injunctive Relief) and the Direct Purchaser**
**Damages Sub-Class (for Damages)**

117.    Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

118.    As to this count, "the Class" refers to the Nationwide Class (seeking injunctive relief) and the Direct Purchaser Damages Sub-Class (seeking damages).

119.    Beginning in at least 2014, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded to jointly boycott entities that would have introduced price-reducing electronic sales of Crop Inputs in the United States, in order to artificially raise, fix, maintain, and /or stabilize prices in the Crop Inputs market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

120.    Defendants' actions were not mere independent parallel conduct but took place in the context of multiple facts evincing a conspiracy.

121.    First, the market for Crop Inputs is highly concentrated, as Defendants BASF, Corteva, Syngenta, and Bayer AG dominate production in virtually every Crop Input category, and control 85% of the corn seed market, over 75% of the soybean seed market, and over 90% of the cotton seed market. The wholesale market is just as concentrated, with seven wholesalers accounting for 70% of all sales volume.

122.    Second, an effective boycott of ecommerce Crop Inputs sales platforms would not have been feasible without coordination and cooperation between Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan, otherwise one Manufacturer Defendant breaking with the boycott could have established itself as the primary supplier to ecommerce Crop Inputs sales platforms and grown its customer base by operating a new distribution channel for Crop Inputs, taking market share from its rival manufacturers.

123.    Third, Defendants had a strong motive to conspire to preserve the presently opaque market structure. If ecommerce Crop Inputs sales platforms succeeded in publicly publishing price lists for Crop Inputs, then the Defendants could no longer keep prices confidential and charge

varying prices based on geography or through seed relabeling or bundling. The Wholesaler and Retailer Defendants were therefore motivated to conspire amongst themselves and exert pressure on the Manufacturer Defendants to protect their profits without having to compete on the merits of price and services.

124.    Fourth, Defendants formed and maintained their conspiracy using a high degree of inter-firm communication both directly and through wholesalers and retailers, such as through CropLife America's annual board of directors meeting which specifically discussed the threat posed by the entry of ecommerce Crop Inputs sales platforms. Because no farmer representatives can participate, these meetings provided a forum for collusion.

125.    Fifth, Defendants' actions were against their apparent economic self-interest in the absence of an agreement. Providing Crop Inputs to ecommerce Crop Inputs sales platforms presented a significant business opportunity. Ecommerce Crop Inputs platforms represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant, would simplify the distribution channel and permit Manufacturer Defendants to retain greater profit by eliminating transport costs, rebates, and incentive programs to wholesalers and retailers. Ecommerce Crop Inputs platforms further presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

126.    Sixth, Defendants are antitrust recidivists, which is probative of future collusion. *See*, *e.g.*, *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2004). Competition experts have noted that past experience participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection.

Competition Policy International maintains a list of the "fifty-two leading recidivists," in which Defendants BASF and Bayer are among the top 5 leading antitrust recidivists, and Defendant Corteva is also listed.

127.   This conspiracy constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

128.   Alternatively, this conspiracy constitutes a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or procompetitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any business justification or pro-competitive benefits proffered by Defendants would be pretextual, outweighed by the anticompetitive effects of Defendants' conduct, and, in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

129.   Plaintiffs and the other members of the Class have been injured, and will continue to be injured, in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Class have paid more for Crop Inputs than they otherwise would have paid in the absence of Defendants' collusive conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

130.   In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including agreeing to boycott ecommerce Crop Inputs sales platforms by refusing to supply Crop Inputs manufactured by Manufacturer Defendants.

131.   The combination and conspiracy alleged herein has had the following effects, among others:

a. Price competition in the sale of Crop Inputs has been restrained, suppressed, and/or eliminated in the United States;

b. Prices for Crop Inputs sold by Defendants and all their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States; and

c. Those who purchase Crop Inputs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

132.   Plaintiffs and Class members have been injured and will continue to be injured by paying more for Crop Inputs manufactured or sold by Defendants than they would have paid and will pay in the absence of the combination or conspiracy as alleged herein.

133.   Plaintiffs and all Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein. Moreover, members of the Direct Purchaser Damages sub-class are entitled to recover damages to the maximum extent allowed under all applicable laws.

## COUNT II
### Violation of the Illinois State Antitrust Statutes
### On Behalf of the Illinois Indirect Purchaser and State Law Damages Sub-Class

134.   Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

135.   As to this count, "the Class" refers to the Illinois Indirect Purchaser and State Law Damages Sub-Class.

136.    Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/1, *et seq.* with respect to purchases of Crop Inputs by Class members and/or purchases by Illinois residents.

137.    Defendants' combination or conspiracy had the following effects:

   a.   Crop Inputs price competition was restrained, suppressed, and eliminated throughout Illinois;

   b.   Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois;

   c.   members of the Class were deprived of free and open competition; and

   d.   members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

138.    During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

139.    As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

140.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. Ann. 10/3, *et seq.* Accordingly, members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. Ann. 10/3, *et seq.*

**COUNT III**
**Violation of Illinois State Consumer Protection Statutes**
**On Behalf of the Indirect Purchaser and State Law Damages Sub-Class**

141.    Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

142.     As to this count, "the Class" refers to the Illinois Indirect Purchaser and State Law Damages Sub-Class.

143.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/1, et seq. with respect to purchases of Crop Inputs in Illinois by Class members and/or purchases by Illinois residents.

144.     Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for Crop Inputs.

145.     During the Class Period, Defendants' illegal conduct had a substantial effect on Illinois commerce.

146.     As a direct and proximate result of Defendants' unlawful conduct, members of the Class have been injured in their business and property and are threatened with further injury.

147.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 505/1, *et seq.,* and, accordingly, members of the Class seek all relief available under that statute.

### COUNT IV

### Unjust Enrichment
### On Behalf of the Illinois Indirect Purchaser and State Law Damages Sub-Class

148.     Plaintiffs incorporate and reallege every allegation in the preceding paragraphs, as though fully set forth herein.

149. As to this count, "the Class" refers to the Illinois Indirect Purchaser and State Law Damages Sub-Class.

150. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Crop Inputs.

151. Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class and sub-classes of all others so similarly situated, respectfully request judgment against Defendants as follows:

A. That the Court determines that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class and Sub-Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class and sub-class, once certified;

B. That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed:

1. An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. A *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

4.   Acts of unjust enrichment by Defendants as set forth herein.

C.      That Plaintiffs and members of the Class and sub-classes recover damages, to the maximum extent allowed under the applicable federal and state laws, and that joint and several judgments in favor of Plaintiffs and the members of the Class and sub-classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information;

F.      Plaintiffs and the members of the Class and sub-class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

G.     Plaintiffs and the members of the Class and sub-class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.     Plaintiffs and the members of the Class and sub-classes have such other and further relief as the case may require and the Court deem just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Respectfully submitted,

/s/ *Charles R. Watkins*

Charles R. Watkins
GUIN, STOKES & EVANS, LLC
805 Lake Street #226
Oak Park, IL  60301
(312) 878-8391
charlesw@gseattorneys.com

David J. Guin
Tammy M. Stokes
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. N.
Title Building, Suite 600
Birmingham, AL  35203
(205) 226-2282
davidg@gseattorneys.com
tammys@gseattorneys.com